1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

þ     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

      **For the fiscal year ended December 31, 2010**

o     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

      **For the transition period from _____ to _____**

**Commission File Number: 000-50058**

# Portfolio Recovery Associates, Inc.

*(Exact name of registrant as specified in its charter)*

| Delaware | 75-3078675 |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| 120 Corporate Boulevard, Norfolk, Virginia | 23502 |
| *(Address of principal executive offices)* | *(Zip Code)* |

Registrant's telephone number, including area code: (888) 772-7326

Securities registered pursuant to Section 12(b) of the Act:

Common Stock, $0.01 par value per share
*(Title of Class)*

Securities registered pursuant to Section 12(g) of the Act: <u>None</u>

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES þ NO o

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15 (d) of the Act. YES o NO þ

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities and Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES þ NO o

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). YES þ NO o

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by

reference in Part III of this Form 10-K or any amendment of this Form 10-K. o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer þ    Accelerated filer o    Non-accelerated filer o    Smaller reporting company o.
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

YES o NO þ

The aggregate market value of the common stock held by non-affiliates of the registrant as of June 30, 2010 was $1,109,804,772 based on the $66.78 closing price as reported on the NASDAQ Global Stock Market.

The number of shares of the registrant's Common Stock outstanding as of February 18, 2011 was 17,104,930.

Documents incorporated by reference: Portions of the Proxy Statement to be filed by approximately April 20, 2011 for our 2011 Annual Meeting of Stockholders are incorporated by reference into Items 10, 11, 12, 13 and 14 of Part III of this Form 10-K.

**Table of Contents**

**Part I**
Item 1. Business                                                                                            4
Item 1A. Risk Factors                                                                                      18
Item 1B. Unresolved Staff Comments                                                                         25
Item 2. Properties                                                                                         26
Item 3. Legal Proceedings                                                                                  26
Item 4. (Removed and Reserved)                                                                             27

**Part II**
Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity
    Securities                                                                                             27
Item 6. Selected Financial Data                                                                            29
Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations              32
Item 7A. Quantitative and Qualitative Disclosure about Market Risk                                         56
Item 8. Financial Statements and Supplementary Data                                                        57
Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure               87
Item 9A. Controls and Procedures                                                                           87
Item 9B. Other Information                                                                                 90

**Part III**
Item 10. Directors, Executive Officers and Corporate Governance                                            90
Item 11. Executive Compensation                                                                            90
Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters     90
Item 13. Certain Relationships and Related Transactions, and Director Independence                         90
Item 14. Principal Accountant Fees and Services                                                            90

**Part IV**
Item 15. Exhibits and Financial Statement Schedules                                                        91

Signatures                                                                                                 93
Exhibit List
EX-21.1
EX-23.1
EX-31.1
EX-31.2
EX-32.1
EX-101 INSTANCE DOCUMENT
EX-101 SCHEMA DOCUMENT
EX-101 CALCULATION LINKBASE DOCUMENT
EX-101 LABELS LINKBASE DOCUMENT
EX-101 PRESENTATION LINKBASE DOCUMENT
EX-101 DEFINITION LINKBASE DOCUMENT

**Table of Contents**

**Owned Portfolio Collection Operations**

*Call Center Operations*

Our work flow management system places, recalls and prioritizes accounts in collectors' work queues, based on our analyses of our accounts and other demographic, credit and customer behavior attributes and prior collection work activities. We use this process to focus our work effort on those customers most likely to pay on their accounts and to rotate to other collectors the non-paying but most likely to pay accounts from which other collectors have been unsuccessful in receiving payment. The majority of our collections occur as a result of telephone contact with customers; however, letters and legal activity also generate meaningful levels of cash collections.

The collectability forecast for a newly acquired portfolio will help determine our initial collection strategy. Accounts that are determined to have the highest predicted collection probability may be sent immediately to collectors' work queues. Less collectible accounts may be set aside as house accounts to be collected using a predictive dialer or another passive, low cost method. After owning an account for a month we begin reassessing the collectability on a daily basis based on a set of observed account characteristics and behaviors. Some accounts may be worked using a letter and/or settlement strategy. We may obtain credit reports for various accounts after the collection process begins.

Our computer system allows each collector to view the scanned documents relating to the account which have been received from the seller, which can include the original account application and payment checks, customer correspondence and other documents. A typical collector work queue may include 300 to 600 accounts or more. The work queue is depleted and replenished automatically by our computerized work flow system.

On the initial contact call, a customer is given a standardized presentation regarding the benefits of resolving his or her account with us. Emphasis is placed on determining the reason for the customer's default in order to better assess the customer's situation and create a plan for repayment. The collector is incentivized to have the customer pay the full balance of the account although this occurs very infrequently. If the collector cannot obtain payment of the full balance, the collector will suggest a repayment plan which generally includes an approximate 20% down payment with the balance to be repaid over an agreed upon period. At times, when determined to be appropriate, and in many cases with management approval, a reduced lump-sum settlement may be agreed upon. If the customer elects to utilize an installment plan, we have developed a system which enables us to make withdrawals from a customer's bank account, in accordance with the directions of the customer.

If a collector is unable to establish contact with a customer based on information received, the collector must undertake skip tracing procedures to develop important account information. Skip tracing is the process of developing new phone, address, job or asset information on a customer, or verifying the accuracy of such information. Each collector does his or her own skip tracing using a number of computer applications available at his or her workstation, a process which is significantly supplemented by a series of automated skip tracing procedures implemented by us on a regular basis.

*Legal Recovery*

An important component of our collections effort involves our legal recovery department and the judicial collection of accounts of customers who have the ability, but not the willingness, to resolve their obligations. Accounts for which the customer is not cooperative and for which we can establish garnishable wages or attachable assets are reviewed for legal action. Additionally, we review accounts using a proprietary scoring model and select those accounts reflecting a high propensity to pay in a legal environment. Depending on the balance of the defaulted consumer receivable and the applicable state collection laws, we determine whether to commence legal action to judicially collect on the receivable. The legal process can take an extended period of time, but it also generates cash collections that likely would not have been realized otherwise.

11

**Table of Contents**

*Network Technology*

To provide delivery of our applications, we utilize Intel-based workstations across our entire business operation. The environment is configured to provide speeds of 100 megabytes to the desktops of our collections and administration staff. Our one gigabyte server network architecture supports high-speed data transport. Our network system is designed to be scalable and meet expansion and inter-building bandwidth and quality of service demands.

*Database and Software Systems*

The ability to access and utilize data is essential to us being able to operate in a cost-effective manner. Our centralized computer-based information systems support the core processing functions of our business under a set of integrated databases and are designed to be both replicable and scalable to accommodate our internal growth. This integrated approach helps to assure that data sources are processed efficiently. We use these systems for portfolio and client management, skip tracing, check taking, financial and management accounting, reporting, and planning and analysis. The systems also support our customers, including on-line access to account information, account status and payment entry. We use a combination of Microsoft and Oracle database software to manage our portfolios and financial, customer and sales data. Government Services, IGS and CCB all maintain unique, proprietary software systems that manage the movement of data, accounts and information throughout these business units.

*Redundancy, System Backup, Security and Disaster Recovery*

Our data centers provide the infrastructure for collection services and uninterrupted support of data, applications and hardware for all of our business units. We believe our facilities and operations include sufficient redundancy, file back-up and security to ensure minimal exposure to systems failure or unauthorized access. The preparations in this area include the use of call centers in Virginia, Kansas, Alabama and Tennessee in order to help provide redundancy for data and processes should one site be completely disabled. We have a disaster recovery plan covering our business that is tested on a periodic basis. The combination of our locally distributed call control systems provides enterprise-wide call and data distribution between our call centers for efficient portfolio collection and business operations. In addition to data replication between the sites, incremental backups of both software and databases are performed on a daily basis and a full system backup is performed weekly. Backup data tapes are stored at an offsite location along with copies of schedules and production control procedures, procedures for recovery using an off-site data center, and documentation and other critical information necessary for recovery and continued operation. Our Virginia headquarters has two separate telecommunications feeds, uninterruptible power supplies and natural gas and diesel-generators, all of which provide a level of redundancy should a power outage or interruption occur. We also have generators installed at each of our call centers, as well as our subsidiary locations in Alabama, California and Nevada. We also employ rigorous physical and electronic security to protect our data. Our call centers have restricted card key access and appropriate additional physical security measures. Electronic protections include data encryption, firewalls and multi-level access controls.

*Predictive Dialer Technology*

The Avaya Proactive Contact Dialer enables our collection staff to focus on certain defaulted consumer receivables according to our specifications. Its predictive technology takes into account all collection campaign and dialing parameters and is able to automatically adjust its dialing pace to match changes in campaign conditions and provide the lowest possible wait times and abandon rates, with the highest volume of outbound calls.

*Display Screens for Real Time Data Utilization*

We utilize multiple plasma displays at most of our collection facilities to aid in recovery of portfolios. The displays provide real-time business-critical information to our collection personnel for efficient collection efforts such as telephone, production, employee status, goal trending, training and corporate information.

14

**Table of Contents**

communications to account debtors. In addition, our Office of General Counsel regularly researches, and provides collections personnel and our training department with summaries and updates of changes in federal and state statutes and relevant case law so that they are aware of and in compliance with changing laws and judicial decisions when skip-tracing or collecting accounts.

**Regulation**

Federal and state statutes establish specific guidelines and procedures which debt collectors must follow when collecting customer accounts. It is our policy to comply with the provisions of all applicable federal laws and corresponding state statutes in all of our recovery activities. Our failure to comply with these laws could have a material adverse effect on us in the event and to the extent that they apply to some or all of our recovery activities. Federal and state consumer protection, privacy and related laws and regulations extensively regulate the relationship between debt collectors and debtors, and the relationship between customers and credit card issuers. Significant federal laws and regulations applicable to our business as a debt collector include the following:

• *Fair Debt Collection Practices Act.* This act imposes certain obligations and restrictions on the practices of debt collectors, including specific restrictions regarding communications with customers, including the time, place and manner of the communications. This act also gives consumers certain rights, including the right to dispute the validity of their obligations and a right to sue debt collectors who fail to comply with its provisions, including the right to recover their attorney fees.

• *Fair Credit Reporting Act.* This act places certain requirements on credit information providers regarding the verification of the accuracy of information provided to credit reporting agencies and investigating consumer disputes concerning the accuracy of such information. We provide information concerning our accounts to the three major credit reporting agencies, and it is our practice to correctly report this information and to investigate credit reporting disputes. The Fair and Accurate Credit Transactions Act amended the Fair Credit Reporting Act to include additional duties applicable to data furnishers with respect to information in the consumer's credit file that the consumer identifies as resulting from identity theft, and requires that data furnishers have procedures in place to prevent such information from being furnished to credit reporting agencies.

• *Gramm-Leach-Bliley Act.* This act requires that certain financial institutions, including collection agencies, develop policies to protect the privacy of consumers' private financial information and provide notices to consumers advising them of their privacy policies. This act also requires that if private personal information concerning a consumer is shared with another unrelated institution, the consumer must be given an opportunity to opt out of having such information shared. Since we do not share consumer information with non-related entities, except as required by law, or except as needed to collect on the receivables, our consumers are not entitled to any opt-out rights under this act. This act is enforced by the Federal Trade Commission, which has retained exclusive jurisdiction over its enforcement, and does not afford a private cause of action to consumers who may wish to pursue legal action against a financial institution for violations of this act.

• *Electronic Funds Transfer Act.* This act regulates the use of the Automated Clearing House ("ACH") system to make electronic funds transfers. All ACH transactions must comply with the rules of the National Automated Check Clearing House Association ("NACHA") and Uniform Commercial Code § 3-402. This act, the NACHA regulations and the Uniform Commercial Code give the consumer, among other things, certain privacy rights with respect to electronic fund transfer transactions, the right to stop payments on a pre-approved fund transfer, and the right to receive certain documentation of the transaction. This act also gives consumers a right to sue institutions which cause financial damages as a result of their failure to comply with its provisions.

• *Telephone Consumer Protection Act.* In the process of collecting accounts, we use automated predictive dialers and pre-recorded messages to communicate with our consumers. This act and similar state laws place certain restrictions on telemarketers and users of automated dialing equipment and pre-recorded messages who place telephone calls to consumers.

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Portfolio Recovery Associates, Inc.

(Registrant)

Dated: February 25, 2011          By: /s/ Steven D. Fredrickson
                                  Steven D. Fredrickson
                                  President, Chief Executive Officer and
                                  Chairman of the Board
                                  (Principal Executive Officer)

Dated: February 25, 2011          By: /s/ Kevin P. Stevenson
                                  Kevin P. Stevenson
                                  Chief Financial and Administrative Officer,
                                  Executive Vice President, Treasurer and Assistant Secretary
                                  (Principal Financial and Accounting Officer)

**KNOW ALL MEN BY THESE PRESENTS,** that each of the undersigned whose signature appears below constitutes and appoints Steven D. Fredrickson and Kevin P. Stevenson, his true and lawful attorneys-in-fact, with full power of substitution and resubstitution for him and on his behalf, and in his name, place and stead, in any and all capacities to execute and sign any and all amendments or post-effective amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that said attorneys-in-fact or any of them or their or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof and the registrant hereby confers like authority on its behalf.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

Dated: February 25, 2011          By: /s/ Steven D. Fredrickson
                                  Steven D. Fredrickson
                                  President and Chief Executive Officer
                                  (Principal Executive Officer)

Dated: February 25, 2011          By: /s/ Kevin P. Stevenson
                                  Kevin P. Stevenson
                                  Chief Financial and Administrative Officer,
                                  Executive Vice President, Treasurer and
                                  Assistant Secretary
                                  (Principal Financial and Accounting
                                  Officer)

Dated: February 25, 2011          By: /s/ John H. Fain
                                  John H. Fain
                                  Director

Dated: February 25, 2011                    By: /s/ John E. Fuller
                                                John E. Fuller
                                                Director


Dated: February 25, 2011                    By: /s/ Penelope W. Kyle
                                                Penelope W. Kyle
                                                Director

**Table of Contents**

Dated: February 25, 2011                    By:  /s/ David N. Roberts
                                                 David N. Roberts
                                                 Director


Dated: February 25, 2011                    By:  /s/ Scott M. Tabakin
                                                 Scott M. Tabakin
                                                 Director


Dated: February 25, 2011                    By:  /s/ James M. Voss
                                                 James M. Voss
                                                 Director

94